## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

**AMERICAN TRAIN DISPATCHERS ASSOCIATION**, *et al.*,

Plaintiffs,

v.

**NATIONAL RAILWAY LABOR CONFERENCE**, *et al.*,

Defendants.

---

Case No. 1:20-cv-02139 (TNM)

## <u>MEMORANDUM OPINION</u>

This case is about what dispute resolution process applies to a disagreement between railroads and their employees.  A group of unions representing railroad employees ("Unions") sue to prevent various railroads from implementing changes to their health benefit plans outside collective bargaining.  The railroads want to reorganize the current vendors that contract with the employees' health care providers.  The railroads also seek to adopt a program designed to manage opioid prescription use.  The Unions contend that both proposals qualify as "major" disputes subject to the formal bargaining processes under the Railway Labor Act ("RLA").

The railroads move to dismiss for lack of jurisdiction.  They claim that both proposals constitute "minor" disputes because they arguably relate to the plans' "administration," and the parties assigned a "neutral" to exclusively resolve such disputes if the parties deadlocked.

There is a strong presumption that a dispute is "minor" under the RLA.  The Court need only find that the employer's contested action is "arguably justified" under the parties' existing agreement.  The railroads clear this low bar.  The Court will therefore dismiss the case.

## I.

Defendants are several railroads and the National Railway Labor Conference, an association of railroads that represents its members with labor relations (collectively, "Railroads").[1]  Compl. ¶¶ 15–22, ECF No. 1.  The Railroads and Unions[2] maintain two multiemployer health benefit plans ("Plans") that provide health care benefits to rail employees and their families.  *See id.* ¶¶ 3, 32; Decl. of Dennis R. Pierce ("Pierce Decl.") ¶ 8, ECF No. 10-1.  The Plans' benefits are provided through the Managed Medical Care Program ("MMCP") and the Comprehensive Health Care Benefit ("CHCB") program.  Pierce Decl. ¶ 42.  MMCP offers "enhanced benefits" if members "utilize in-network medical service providers."  *Id.*  CHCB "generally provides uniform benefit levels for medical services without financial incentives to utilize particular providers."  *Id.*

The Plans use UnitedHealthcare, Aetna, and Highmark Blue Cross/Blue Shield ("Highmark") as the network vendors that manage the MMCP preferred healthcare providers throughout the country.  *Id.*  A network's availability depends on the geographic region.  Decl. of Brendan M. Branon in Supp. Defs.' Mot. Dismiss ("Branon Decl.") ¶ 14, ECF No. 7.

---

[1]  They include:  BNSF Railway Company, Kansas City Southern Railway Company, CSX Transportation, Grand Trunk Western Railroad Company, Norfolk Southern Railway Company, Soo Line Railway Company, and Union Pacific Railway Company.  Compl. ¶¶ 16–22.

[2]  The unions include:  American Train Dispatchers Association; Brotherhood of Locomotive Engineers and Trainmen, a Division of the Rail Conference of the International Brotherhood of Teamsters; Brotherhood of Maintenance of Way Employes Division of the International Brotherhood of Teamsters; International Brotherhood of Boilermakers; Brotherhood Railroad Signalmen; International Association of Machinists and Aerospace Workers; International Association of Sheet Metal, Air, Rail and Transportation Workers, Mechanical Division; International Association of Sheet Metal, Air, Rail and Transportation Workers, Transportation Division; International Brotherhood of Electrical Workers; National Conference of Fireman & Oilers District, Local 32BJ, SEIU; Transportation Communications Union/IAM; and the Transport Workers Union.  Compl. ¶¶ 3–14.

The parties collectively bargain over changes to the Plans.  Pierce Decl. ¶ 9; Branon Decl. ¶¶ 8–10.  Each plan incorporates a Summary Plan Description ("SPD") detailing the benefits offered.  Pierce Decl. ¶ 10; Branon Decl. ¶ 10.  The SPDs are updated to reflect changes to the Plans.  Pierce Decl. ¶ 10; Branon Decl. ¶ 10.

A joint committee with equal representation from labor and management administers the Plans ("Joint Committees").  The Joint Plan Committee ("JPC") administers the Railroad Employees National Health and Welfare Plan ("National Plan"), and the Governing Committee administers the National Railway Carriers and United Transportation Union Health and Welfare Plan ("UTU Plan").  *See* Compl. ¶¶ 33–34, 36; Pierce Decl. ¶ 9.  These Joint Committees serve as fiduciaries to the Plans.  *See* Branon Decl. Ex. 1 Art. VI §§ 6.1, 6.3 at 73–74, ECF No. 7-1; *id.* Ex. 2 Art. VI §§ 6.1, 6.4 at 8, 11, ECF No. 7-2.[3]

The Joint Committees also include a "neutral."[4]  This member must vote when the labor and management representatives "deadlock" on any matter "arising out of the interpretation, application or administration (including investment policy) of the Plan":

> A neutral shall be retained by and at the expense of the Plan for the duration of this [] Agreement to consider and vote on any matter brought before the Joint Plan Committee (formerly the Joint Policyholder Committee), arising out of the interpretation, application or administration (including investment policy) of the Plan, but only if the [JPC] is deadlocked with respect to the matter.  A deadlock shall occur whenever the carrier members of the [JPC], who shall have a total of one vote regardless of their number, and the organization members of the [JPC], who shall also have a total of one vote regardless of their number, do not resolve a matter by a vote of two to nil and either side declares a deadlock.

---

[3]  All citations are to the page numbers generated by this Court's CM/ECF system.

[4]  The parties agreed to a new neutral member in June 2020.  Pierce Decl. ¶ 34.

*Id.* Ex. 20 Art. III Part A § 3 at 10, ECF No. 7-22; *see also id.* Ex. 2 Art. VI § 6.2(f)(4) at 10

(containing similar provision for neutral member under UTU Plan).  The neutral has never been

used.  Compl. ¶ 61.

The Railroads and Unions are currently engaged in bargaining over proposed

amendments to their collective bargaining agreements.  *Id.* ¶¶ 30–31.  As part of that bargaining,

the Railroads "seek to modernize the [Plans'] design and administrative practices," which

includes to "[a]dopt all pharmacy management rules and programs to ensure appropriate

medications are being prescribed" and to "[r]econfigure the medical vendor network to utilize

networks with favorable provider discounts and overall cost of care."  *Id.* ¶ 38 (cleaned up); *see*

*also* Pierce Decl. ¶ 23.

Meanwhile, the Railroads raised similar proposals through the Joint Committees.  Compl.

¶¶ 39, 48.  Two are relevant here.  First, the Railroads want an Advanced Opioid Management

Program ("AOM Program").  *Id.* ¶ 39.  The AOM Program "would, among other things, limit

prescription amounts, dosages and permissible usage, require prior authorizations, and limit the

locations where a prescription could be filled by a patient."  *Id.* ¶ 40.  Second, the Railroads re-

raised their proposal to reconfigure the Plans' health care network vendors "to utilize networks

with favorable provider discounts and overall cost of care."  *Id.* ¶¶ 38, 54.  The Unions'

representatives rejected both proposals in the Joint Committees, arguing that the parties must

handle them through collective bargaining.  *Id.* ¶¶ 51, 55–56.

The Railroads disagreed.  They claimed that the Joint Committees can (and should) adopt

both proposals and that a "failure to do so violated their fiduciary duty to the Plans."  *Id.* ¶ 58.

The Railroads also asserted that the neutral should resolve any dispute over the proposals.  *Id.*

The Unions now sue the Railroads.  They claim that the Railroads' "position here is a gross misuse" of the Joint Committees and "nothing short of a thinly veiled attempt to circumvent the collective bargaining process and their obligation to engage in good faith bargaining" under the RLA.  *Id.* ¶ 62.  The Unions bring a single count of "[v]iolation of the RLA."  *Id.* at 25.  Under the Unions' theory, the Railroads' "intention to force the Unions to bargain over these proposed health and welfare changes" through the Joint Committees "is contrary to the RLA and its duty to bargain in good faith with the Unions."  *Id.* ¶ 67.  The Unions seek declaratory and injunctive relief to force the Railroads to address the network realignment and AOM Program proposals through the collective bargaining process, not the Joint Committees.  *Id.* at 27.

The Railroads move to dismiss the complaint for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  *See* Defs.' Mot. Dismiss, ECF No. 6.  They contend that the Joint Committees' neutral must resolve this dispute over the two proposals because they are matters of Plan "administration."  Statement of P. & A. in Supp. Defs.' Mot. Dismiss ("Defs.' Mem.") at 32–37, ECF No. 6-1.  The motion is ripe for disposition.

## II.

To survive a dismissal motion under 12(b)(1), the plaintiff bears the burden of establishing the court's jurisdiction over the claims.  *See Moms Against Mercury v. FDA*, 483 F.3d 824, 828 (D.C. Cir. 2007).  "The court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion because subject-matter jurisdiction focuses on the court's power to hear the claim."  *Adams v. U.S. Capitol Police Bd.*, 564 F. Supp. 2d 37, 40 (D.D.C. 2008).  A court may also

consider materials outside the pleadings to evaluate whether it has jurisdiction.  *See Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

Jurisdiction here rests on whether the parties' dispute is "major" or "minor" under the RLA.[5]  Classifying the dispute as major or minor dictates the track the parties must take to resolve their dispute.  Minor disputes are "first to be handled according to the grievance procedure agreed upon in the CBA and, if unsuccessful, are submitted to mandatory arbitration before the National Railroad Adjustment Board or . . . a special board of adjustment established by the carrier and union."  *Int'l Bhd. of Teamsters v. Atlas Air, Inc.*, 435 F. Supp. 3d 128, 134 (D.D.C. 2020).  "The district court has jurisdiction to compel arbitration of such disputes."  *Ass'n of Flight Attendants, AFL-CIO v. United Airlines, Inc.*, 71 F.3d 915, 917 (D.C. Cir. 1995).  Courts, however, retain jurisdiction to resolve major disputes.  *See Consol. Rail Corp. v. Ry. Lab. Execs.' Ass'n*, 491 U.S. 299, 302–03 (1989) ("*Conrail*").

"[M]ajor disputes seek to create contractual rights, minor disputes to enforce them."  *Id.* at 302.  Major disputes relate to "the formation of collective agreements or efforts to secure them."  *Elgin, J. & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1946).  "They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy."  *Id.*

Minor disputes, on the other hand, "contemplate[] the existence of a collective agreement already concluded."  *Id.*  They involve a "question about how to interpret an existing collective bargaining agreement, like the meaning of a term or whether the agreement permits a certain action."  *Atlas Air., Inc. v. Int'l Bhd. of Teamsters*, 928 F.3d 1102, 1108 (D.C. Cir. 2019).

---

[5]  "The statutory bases for the major dispute category are § 2 Seventh and § Sixth of the RLA."  *Consol. Rail Corp. v. Ry. Lab. Execs.' Ass'n*, 491 U.S. 299, 302 (1989).  "[T]he minor dispute category is predicated on § 2 Sixth and § 3 First (i) of the RLA."  *Id.* at 303.

In *Conrail*, the Supreme Court established the governing test to decide whether a dispute is "major" or "minor":  "Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is *arguably justified* by the terms of the parties' collective-bargaining agreement.  Where, in contrast, the employer's claims are *frivolous* or *obviously insubstantial*, the dispute is major."  491 U.S. at 307 (emphasis added).  *Conrail* establishes a "relatively light burden" to show that a dispute is minor.  *Id.*  Indeed, "if there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor."  *Air Line Pilots Ass'n, Int'l v. E. Air Lines, Inc.*, 869 F.2d 1518, 1521 (D.C. Cir. 1989) (cleaned up).  There is a "strong presumption that the dispute is minor."  *Id.* at 1522.  So "few disputes that arise during the term of a collective bargaining agreement cannot arguably be resolved by reference to the agreement."  *Id.*

"In determining whether a dispute is major or minor under the RLA, the court does not consider the merits of the underlying dispute; its role is limited to determining whether the dispute can be characterized as involving the proper application or meaning of a contract provision."  *Id.* at 1521 (cleaned up).  A court must "look beyond the complaint to the arguments of the party asserting a contractual basis for the disputed action."  *Bhd. of Maint. of Way Employes Div./IBT v. Nat'l R.R. Passenger Corp.*, 217 F. Supp. 3d 249, 256 (D.D.C. 2016).

### III.

The Unions resist application of the *Conrail* test here for two reasons.  *See* Pls.' Opp'n at 26–29.  Both are unpersuasive.

*First*, Plaintiffs claim that *Conrail* only governs disputes arising under Section 3 of the RLA, which they claim the Railroads do not invoke.[6]  *See id.* at 27 ("In short, *Conrail* only divests the court of jurisdiction if the dispute involves a Section 3 grievance or Section 3 Adjustment Board, which is not the case here.").  But the Unions have the test backwards:  the dispute governs the type of forum, not the other way around.  So under *Conrail*, courts do not first decide whether Section 3 of the RLA applies.  They instead determine whether the dispute is major or minor.  That determination then controls where the parties must resolve their dispute. *Accord Nat'l R.R. Passenger Corp. v. United Transp. Union*, 832 F. Supp. 7, 10 (D.D.C. 1993) ("[T]he Court must first determine whether the underlying controversy in this case constitutes a major or a minor dispute.  This determination dictates the proper administrative procedures that the parties must adhere to for resolution of the dispute as well as this Court's authority to intervene in the controversy." (cleaned up)).

*Second*, the Unions rely on the Circuit's decision in *Atlas Air* to claim that *Conrail* is "inapplicable" to disputes "over the terms of a new or amended collective bargaining agreement" or "over conduct that grows out of the effort to negotiate that agreement."  Pls.' Opp'n at 28–29 (cleaned up).  The Unions argue that *Atlas Air* controls here because the Railroads seek to "alter the *status quo* and impose new terms outside bargaining" to "interfere in and unduly influence ongoing bargaining."  *Id.* at 29.  The Court disagrees.

---

[6]  For their part, the Railroads disagree that the Plans' provision for a neutral does not qualify under Section 3 of the RLA, which allows parties to enter a "voluntary agreement" to arbitrate. *See* Defs.' Reply at 8; *see also* 45 U.S.C. § 153 Second (authorizing parties to "mutually agree[] to the establishment of system, group, or regional boards of adjustment for the purpose of adjusting and deciding disputes of the character specified in this section").  The Unions did not have a chance to respond to this argument, but the Court need not decide it.  As the Court will explain, application of the *Conrail* test does not first require the Court to determine whether Section 3 of the RLA applies here.

In *Atlas Air*, the Circuit acknowledged that "[a]s long as the contested 'action is arguably justified by the terms of the parties' collective-bargaining agreement,' we treat the dispute as minor."  928 F.3d at 1108 (quoting *Conrail*, 491 U.S. at 307).  There, however, the carrier "consistently maintained that this dispute cannot be resolved by the existing agreement," and disclaimed reliance on the parties' agreement.  *Id.* at 1110.  The court thus reasoned that "[t]his is not a case about whether the existing [agreement] arguably permits the Union or its members to act in this manner, or whether the [agreement] establishes a process to resolve disputes about its interpretation."  *Id.*  Instead, the union's conduct surrounding the negotiations was at issue.  *Id.* at 1109–10 (noting carrier's claim that the union put "economic pressure[] on the other to enhance its own bargaining position" (cleaned up)).  So the dispute was major "[b]ecause the existing [agreement did] not even arguably speak to whether this conduct [was] permissible when done in furtherance of that particular goal."  *Id.* at 1110.

Not so here.  The Unions may describe the Railroads' position as a "thinly veiled attempt to circumvent the collective bargaining process and their obligation to engage in good faith bargaining."  Compl. ¶ 62.  But their characterization does not control.  *See Conrail*, 491 U.S. at 306 ("[T]here is a danger in leaving the characterization of the dispute solely in the hands of one party.").  Courts "look beyond the complaint to the arguments of the party asserting a contractual basis for the disputed action."  *Bhd. of Maint. of Way Employes Div./IBT*, 217 F. Supp. 3d at 256.  And here, the Railroads' main contention is that the network realignment and AOM Program proposals "could be implemented as matters of Plan 'administration.'"  *See* Defs.' Mem. at 32.  The question then is whether the Railroads' proposals are "arguably justified" under the Plans.  *Conrail*, 491 U.S. at 307.

In any event, the Unions do not seek to challenge the Railroads' conduct during negotiations, as in *Atlas Air*. The Unions request a declaration that the proposals are "a mandatory subject of collective bargaining pursuant to the RLA"—that they are a "major" dispute. Compl. at 27(b); *see also id.* at 27(a) (seeking declaration that Railroads must bargain over the two proposals). They also want an injunction to prevent the Joint Committees from implementing the network realignment and AOM Program. *Id.* at 27(d). Their focus then is on the two proposals, not the Railroads' conduct.[7]

The Court will thus apply the *Conrail* test. To succeed, the Railroads must show that the network realignment and AOM Program proposals are "arguably justified" as Plan "administration" matters. If they are, the Court lacks jurisdiction because the Unions' challenge is a "minor" dispute under the RLA.

## A.

The Railroads claim that the Joint Committees can realign the network vendors and carry out the AOM Program as Plan "administration." Defs.' Mem. at 10. So the neutral member of the Joint Committees must decide the Unions' challenge. *Id.* at 11.

The Joint Committees each include a neutral "to consider and vote on any matter . . . arising out of the interpretation, application or administration (including investment policy) of the Plan, but only if the Committee is deadlocked with respect to the matter." Ex. 20 Art. III Part A § 3 at 10; *see also id.* Ex. 2 Art. VI § 6.2(f)(4) at 10 (containing similar provision for neutral

---

[7] To be sure, the Railroads raised these same proposals during the parties' collective bargaining negotiations. *See* Compl. ¶¶ 39, 54–58. But the "fact that a dispute arises while parties are in negotiations . . . does not convert a minor dispute into a major dispute." *Allied Pilots Ass'n v. Am. Airlines, Inc.*, No. CV 08-191 (EGS), 2009 WL 10692508, at *6 (D.D.C. Sept. 29, 2009). Whether "the instant dispute arose during [] negotiations need not [a]ffect this Court's analysis regarding whether the dispute is properly classified as a major or minor dispute." *Id.*

under UTU Plan).  The Plans also authorize the Joint Committees to "establish rules for the administration of the Plan."  *See id.* Ex. 1 Art. VI § 6.4 at 74; *id.* Ex. 2 Art. VI § 6.5 at 11.

### 1.

We must first determine the meaning of "administration."  The Railroads suggest that "'administration' is properly conceived of as operation or management of the Plans."  Defs.' Mem. at 29.  In other words, if a proposal does not require amending the Plans, it qualifies as Plan administration.  *Id.* at 30.  This interpretation is not "frivolous or obviously insubstantial." *Conrail*, 491 U.S. at 307.

Indeed, it reflects the common meaning of "administration."  The term generally refers to the "management or performance" of duties.  *Administration*, Black's Law Dictionary (11th ed. 2019).  It is also the "act of administering"—"to perform or execute," "to carry out or oversee the tasks necessary for the running of (an organization)," "to manage, run" or "to manage the affairs of."  *Administration* & *Administering*, Oxford English Dictionary, oed.com.

The Railroads' proffered definition also ensures that "administration" means something different from "interpretation" and "application," the surrounding terms.  *See* Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 176 (2012) ("If a provision is susceptible of (1) a meaning that . . . deprives another provision of all independent effect, and (2) another meaning that leaves both provisions with some independent operation, the latter should be preferred.").  But it is not "so broad that it is inconsistent with [these] accompanying words." *Gustafson v. Alloyd Co.*, 513 U.S. 561, 575 (1995) ("[A] word is known by the company it keeps.").

The Unions do not appear to disagree.  They also construe administration to mean the management of the Plans through the "existing terms," but not "changes to the terms

themselves." Pls.' Opp'n at 30 ("By its plain language, this involves the management or administration of the existing terms of the Plans, as agreed to by the parties in bargaining, not changes to the terms themselves.").

The question, then, is whether the network alignment and AOM Program proposals find support in the existing terms of the Plans. If they do, the proposals arguably fall within Plan "administration" and the Unions cannot challenge them here.

**2.**

The Railroads contend that "it is hardly frivolous" to consider both proposals as "matters of Plan management within the discretionary authority of the Joint Committees" because neither requires "amending any Plan terms." Defs.' Mem. at 32. The Unions disagree. They argue that adopting the proposals would amend existing agreements or plans, or change plan design. Pls.' Opp'n at 30. The Court "takes no position on which party offers the better interpretation." *Bhd. of R.R. Signalmen v. Nat'l R.R. Passenger Corp.*, 310 F. Supp. 3d 131, 141 (D.D.C. 2018). It need only decide whether the Railroads' position is "arguably justified." *Conrail*, 491 U.S. at 307. It is.

**a.**

The Court turns first to the Railroads' proposal to realign the Plans' network vendors. The Railroads contend that the realignment is an exercise of the Plans' existing authority to select the network vendors. Defs.' Mem. at 32–35. Nothing in the realignment "alters benefits, eligibility, coverage, or any other aspects of plan design." *Id.* at 32. The proposal instead addresses which vendor (Highmark, UnitedHealthcare, or Aetna) "will manage the medical providers who offer services to Plan members in certain geographic areas." *Id.*; *see also* Branon

Decl. Ex. 34 at 4–9, ECF No. 7-36.  The Court finds this position neither frivolous nor obviously insubstantial.

The current terms suggest that the Plans "select" the network vendors.  Under the National Plan, member participation in the MMCP—the health care benefits program—is required in some geographic areas.  *See* Branon Decl. Ex. 3 at 61.  The availability of a network vendor in this "Mandatory Network Area" depends on the network "the Plan has selected."  *Id.* If a member lives "where *the Plan has selected* UnitedHealthcare but not Aetna as a managed care vendor, [the member] may choose the MMCP administered by UnitedHealthcare or the MMCP administered by Highmark."  *Id.* at 61.  If a member lives "where *the Plan has selected* Aetna but not UnitedHealthcare as a managed care vendor, [the member] may choose the MMCP administered by Aetna or the MMCP administered by Highmark."[8]  *Id.* at 61–62.  So a member's network selection depends on those networks the Plans offer in the first place.  It is thus arguable that the Plans can realign these same networks made available to members without collective bargaining.[9]

The Railroads' contention also finds some support in the Joint Committees' fiduciary duties.  By their terms, the Plans require the Joint Committees to serve as fiduciaries.  Branon Decl. Ex. 1 Art. VI § 6.1 at 73 ("The Named Fiduciaries of this Plan shall be the Committee. . . ."); *id.* Ex. 2 § 6.1 at 8 (same for Governing Committee); *see also id.* Ex. 1 § 6.3 at 74 (providing that the JPC will carry out "fiduciary duties"); *id.* Ex. 2 § 6.4 at 11 (same for Governing

---

[8]  The UTU Plan contains similar provisions.  *See* Branon Decl. Ex. 4 at 60–61.

[9]  The Railroads also offer some evidence that the Unions at one point supported the neutral resolving issues over the "[s]election of managed care contractors or networks" once the parties agreed "that the minimum standards of a Request for Proposal (RFP) have been met."  Branon Decl. Ex. 17 at 2, ECF No. 7-19 (1990 proposal for "Issues Subject to Dispute Resolution When [JPC] Deadlocks").  While the Unions dispute the significance of this evidence, *see* Pierce Decl. ¶ 54, it at least suggests that the Railroads' position is not novel.

Committee).  "Hiring a service provider in and of itself is a fiduciary function."  U.S. Dep't of

Labor, *Understanding Your Fiduciary Responsibilities Under a Group Health Plan* at 4 (Sept.

2019).[10]  The Department of Labor appears to consider the "selection of a health care provider"

an "exercise of authority or control with the respect to the *management* and disposition of the

plan's assets."  U.S. Dep't of Labor, Information Letter No. 02-19-1998 (Feb. 19, 1998)

(emphasis added).[11]  It is non-frivolous to consider network realignment—which selects vendors

for each geographic region—as an exercise of the Joint Committees' current fiduciary duties.

More, the Railroads show that the Joint Committees already changed vendors under the

Plans without collective bargaining.  Defs.' Mem. at 15.  The Plans changed their mental health

vendor from ValueOptions to United Behavioral Health.  *See* Branon Decl.   ¶ 17; *id.* Ex. 7,

ECF No. 7-7 (Governing Committee letter terminating ValueOptions as vendor).  The Unions

agree.  They note, however, that this action was voluntary, not through the neutral.  Pls.' Opp'n

at 32; *see also* Pierce Decl. ¶¶ 55–56.

Fair enough.  But it does not necessarily follow that the parties cannot pursue the same

changes through the neutral if they deadlock.  Indeed, if the Unions are correct that vendor

selection is a "major" dispute, then even voluntary agreement through the Joint Committees is

improper.  The change would require collective bargaining.  The Railroads thus have some basis

to argue that the Joint Committees can make similar network adjustments here.

---

[10]  Publicly available at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/understanding-your-fiduciary-responsibilities-under-a-group-health-plan.pdf.

[11]  Publicly available at https://www.dol.gov/agencies/ebsa/about-ebsa/our-activities/resource-center/information-letters/02-19-1998.

The Unions claim that the Plans already outline the "network (by name and type) and employees' choice over same," and they argue that the Railroads' "proposal would indeed alter these terms." Pls.' Opp'n at 36. Perhaps. But the Unions fail to overcome the Railroads' "relatively light burden" here. *Conrail*, 491 U.S. at 307. "[T]hey do not convince [the Court] that [the Railroads'] contractual arguments are frivolous or insubstantial." *Id.* at 317.

*First*, the Unions cite a requirement that the Plan offer the MMCP to all employees in a geographic area where (i) it is not currently offered and (ii) UnitedHealthcare, Aetna, or Highmark has a medical network. *See* Pls.' Opp'n at 14, 19. It is not clear, however, how the Railroads' network realignment amends this provision. Under the proposal, at least one of these three networks will still remain in every geographic area. *See* Branon Decl. Ex. 34 at 5. So the Plan can add the MMCP if it is not currently available after the realignment.

*Second*, the Unions rely on a Plan term allowing members to choose an MMCP based on which vendor is "available under the Plan." Pls.' Opp'n at 20 (citing Branon Decl. Exs. 3, 4). For example, "where the MMCP administered by UnitedHealthCare [] is available under the Plan, [a member] may choose an MMCP administered either by UnitedHealthcare or by Highmark." *Id.* The Unions note that the realignment requires the selection of Highmark in certain geographic areas, eliminating a member's current choice of vendors in those areas. *See* Pls.' Opp'n at 21.

The Unions may be correct. But recall that the Railroads also have a colorable argument that "the predicate for member choice is whether the vendor is 'available under the plan' in any particular location." Defs.' Reply at 13. The term that the Unions rely on does not necessarily conflict with the "Railroads' view that the Plans can 'select' which vendors will be available (after which the members can choose, assuming that more than one vendor is available)." *Id.*

*Third*, the Unions point to a Plan provision providing that Highmark "programs that are currently available under the Plan" are available for members who choose MMCP "where the MMCP is made available under the Plan" and for all employees who select CHCB. Pls.' Opp'n at 19–20 (citing Pierce Decl. Ex. 4, ECF No. 10-5). But the network realignment suggests an *increase*, not decrease, in the availability of Highmark as a vendor. *See* Branon Decl. Ex. 34 at 4–5 (noting implementation of "preferred networks available through Highmark"); *id.* at 5 ("In the current review cycle, this criterion would result in Highmark being the only network available in certain locations."). The proposed network realignment presumably complies with this provision.

Thus, under the Plans' existing terms, the Railroads' position that the proposed network realignment qualifies as Plan "administration" is arguably justified.

**b.**

The Court next turns to the AOM Program. The Railroads propose "a full-scale, multi-faceted approach to managing opioid use under the Plan's prescription drug benefit program." Branon Decl. Ex. 28 at 2, ECF No. 7-30. The Railroads argue that the AOM Program finds support in the "various drug access and coverage rules" already included in the Plans. Defs.' Mem. at 36. They suggest that the AOM Program "simply combines prior authorization and quantity limits with an educational campaign." *Id.* Although a close call, the Railroads' position finds enough support to survive the *Conrail* test.

According to the Railroads, the "primary motivation" for the AOM Program is "employee/dependent safety." Branon Decl. Ex. 28 at 2. For example, the program imposes prior authorization for prescribing any "Long-acting opioid." *Id.* at 3. It also includes quantity and dosage limitations and "[p]hysician alerts." *Id.* (proposing, among other things, initial

seven-day fill limit and "[o]pioid adjacent therapy quantity limits"); *id.* Ex. 29 at 6, ECF No. 7-31 (same).  It is not frivolous for the Railroads to claim that these AOM Program components are a natural extension of the existing programs under the Plans.[12]

The National Plan already requires "prior authorization" from the Plans' pharmacy vendor—Express Scripts Inc. ("ESI")—and the physician before it covers some prescription drugs to ensure "that coverage is provided to those participants for whom the medication is safe, effective, and appropriate."  *Id.* Ex. 3 at 138, 145–46.[13]  And "[n]arcotic pain relief" (like opioids) is a drug category subject to this prior authorization.  *Id.* Ex. 9 at 11, 39, ECF No. 11; *id.* Ex. 11, ECF No. 7-13.

The Plans also currently impose restrictions for "[n]arcotic pain relief" through the "Quantity/Duration Limits" program.  *Id.* Ex. 9 at 11, 39; *id.* Ex. 11.  Some medications "are authorized for coverage in a limited quantity within a specified time period."  *Id.* Ex. 3 at 146.  The program "evaluates the quantity and dosing of a medication over a specific timeframe and alerts the pharmacist to the need for a coverage review when the quantity or dose exceeds the covered amount."[14]  *Id.*

More still, the current "Fraud, Waste and Abuse Program" seeks to "identify potential abuse of prescription medications, in particular controlled substances."  Pierce Decl. Ex. 2 at 8, 27, ECF No. 10-3.  If there is such abuse, "appropriate restrictions are implemented by Express

---

[12]  The AOM Program includes other components that the Unions do not appear to challenge, including educational materials provided to members and prescribers.  *See* Branon Decl. Ex. 28 at 3 (noting "Education letter at first fill" and "Presciber education" as part of AOM Program).

[13]  The UTU Plan contains similar provisions.  *See* Branon Decl. Ex. 4 at 137, 144–45.

[14]  The UTU Plan contains similar terms.  *See* Branon Decl. Ex. 4 at 145.

Scripts (pharmacy lock limiting member to one pharmacy or one prescriber) in collaboration with medical vendor." *Id.*

Past practice also lends some support to the Railroads' position. *Accord Conrail*, 491 U.S. at 311 ("[T]he parties' 'practice, usage and custom' is of significance in interpreting their agreement."). ESI has applied prior authorization and dosage limitations on drugs classified as narcotic pain relief with no collective bargaining. Branon Decl. ¶ 24; *see also id.* Ex. 11. ESI also updates the drug "formulary"—drugs covered under the Plans' pharmacy benefits—without the parties. *Id.* ¶ 25. For example, ESI excluded from coverage a list of compounding products "due to the lack of clinical information to support the safety and efficacy of the compounded products." *Id.* Ex. 14 at 4, ECF No. 7-16.

The Unions emphasize that the parties implemented these prior programs as "Plan Design Changes." Pls.' Opp'n at 18, 34–35; *see also* Pierce Decl. ¶¶ 18–19. The Unions also note that the challenged components of the AOM Program—such as supply limitations—qualify as "plan design" matters under the parties' agreement with ESI. Pls' Opp'n at 35 (citing Pierce Decl. Ex. 20, ECF No. 10-21). So the AOM Program cannot constitute Plan "administration."

True, the parties adopted the existing programs through collective bargaining. But the "Achilles' heel of the Unions' argument is that the [Railroads'] actions are 'arguably justified' by the *existing* agreement." *Ry. Lab. Execs. Ass'n v. Chesapeake W. Ry.*, 915 F.2d 116, 120 (4th Cir. 1990) (emphasis in original). It is these *current* terms and programs that provide enough support for the Railroads to clear *Conrail*'s hurdle.[15]

---

[15] For similar reasons, the Court need not resolve the parties' dispute over whether the proposals require a Summary Material Modification notifying members of the changes. *See* Pls.' Opp'n at 36; Defs.' Reply at 18–19. As explained, there is a colorable argument that the existing terms support both proposals with no need to change the Plans' terms. *See Air Line Pilots Ass'n, Int'l*, 869 F.2d at 1522 ("[F]ew disputes that arise during the term of a collective bargaining agreement

Consider the union's challenge in *Conrail*.  There, the union similarly argued that Conrail "departed materially from the parties' agreement" when it claimed that it could "include drug screens in all routine physical examinations."  *Conrail*, 491 U.S. at 316.  The Supreme Court did "not doubt that there [was] a difference between Conrail's past regime . . . and Conrail's present policy."  *Id.* at 318.  Or that the union "conceivably could carry the day in arbitration."  *Id.* at 317.  But "the general breadth of [Conrail's] freedom of action in the past, and by its practice of including drug testing within routine medical examinations in some circumstances" offered enough support to characterize the new drug policy as a minor dispute.[16]  *Id.*

As in *Conrail*, the Unions have non-trivial arguments for why the Railroads' AOM Program proposal goes beyond Plan administration.  But "there is a strong presumption that [a] dispute is minor" and courts resolve all doubts in favor of finding a dispute minor.  *Air Line Pilots Ass'n, Int'l*, 869 F.2d at 1522.  The "dispute is a minor one that must be submitted to arbitration, *even if the court believes that one party's interpretation of the contract lacks merit*." *Id.* at 1521 (emphasis in original).  The Court is satisfied that the Plans' current programs provide the Railroads "freedom of action" to clear their low bar here.  *Conrail*, 491 U.S. at 317.

### 3.

The Unions also cite a "lengthy and established history of bargaining over the Plan's prescription drug benefits and network configurations over the years, all of which are codified"

---

cannot arguably be resolved by reference to the agreement").  Nothing more is required under *Conrail*.

[16]  In *Conrail*, the parties relied exclusively on past practice because the drug policy was an implied, not express, term of their agreement.  491 U.S. at 311 ("Neither party relies on any express provision of the agreement; indeed, the agreement is not part of the record before us."); *id.* at 312 ("Conrail's contractual claim rests solely upon implied contractual terms, as interpreted in light of past practice.").  Here, however, the Railroads point to express terms in the Plans to support their proposals.

in the existing Plans.  Pls.' Opp'n at 32.  Indeed, the Railroads raised the network reconfiguration and AOM Program proposals in collective bargaining.  *See* Compl. ¶¶ 38, 54; Pierce Decl. ¶ 23. But the "fact that a dispute arises while parties are in negotiations . . . does not convert a minor dispute into a major dispute." *Allied Pilots Ass'n*, 2009 WL 10692508, at *6.  In other words, the parties can raise (and agree) to Plan administration matters during collective bargaining without forfeiting a right to pursue them through the Joint Committees.  *See General Comm. of Adjustment, United Transp. Union, W. Md. Ry. Co. v. CSX R.R. Corp.*, 893 F.2d 584, 594 (3d Cir. 1990) (finding proposal during collective bargaining to "seek[] certain changes in the existing collective bargaining agreements [did] not change this minor dispute . . . into a major one" because the proposal cannot "short-circuit the arbitration process Congress specifically designed to resolve minor disputes").

True, the "neutral has never been used to resolve any dispute."  Pls.' Opp'n at 31; Compl. ¶ 61.  But the parties' practice of sidelining the neutral is a testament to their ability to compromise, not the neutral's obsolescence.  Both parties have recognized as much.  When the Unions objected to a proposed audit of the Plans, they acknowledged that the neutral should resolve the dispute if necessary.  *See* Branon Decl. Ex. 26 at 2, ECF No. 7-28 ("[I]f the parties do need to arbitrate this matter, I agree that you should be the arbitrator.  There is no disagreement in this regard."); *see also* Pls.' Opp'n at 31 ("[T]he underlying issue there clearly involved an administration issue over an audit. . . . This was only enforcing the terms of the existing Plans[.]").  The Railroads agreed.  *See* Branon Decl. Ex. 24 at 3, ECF No. 7-26 (noting intent to "declare a deadlock and to ask . . . neutral to be appointed by the Committee, to consider and

vote upon the matter at his earliest convenience").  The neutral thus remains a viable option to resolve a deadlock over Plan administration matters.[17]

**B.**

Finally, the Unions urge the Court to retain jurisdiction over their claim under Section 2, First of the RLA because it "exist[s] outside of the major/minor dispute dichotomy."  Pls.' Opp'n at 37–38.  Not so.

The Unions raise only a single count captioned as "[v]iolation of the RLA."  Compl. at 25.  In that count, the Unions cite several RLA provisions, including Section 2, First.[18]  *Id.* ¶ 64. The Unions do not mention the statute anywhere else in their complaint.  The Court is skeptical that a single citation to a statutory provision among others in the same count is enough to raise a separate cause of action under Section 2, First.  *See* Fed. R. Civ. P. 8(a)(2) (requiring "a short and plain statement of the claim showing that the pleader is entitled to relief").

Even if it did, the Unions' theory under Section 2, First hinges on the parties' dispute being major.  The Unions allege that "[b]y claiming that they can force the Unions to deal with these mandatory subjects of bargaining 'outside bargaining' . . . the [Railroads] have failed in their duty to exert every reasonable effort to make and maintain agreements and bargain with the

---

[17]  The Unions cite the Railroads' recent proposal to "expressly require" the Joint Committees to perform certain functions, including to "implement changes in network offerings" and "implement all mainstream [pharmacy] programs."  Pierce Decl. Ex. 15 at 13, ECF No. 10-16. The Unions argue that such changes would be unnecessary if the Joint Committees already had this authority, as the Railroads suggest.  Pls.' Opp'n at 33.  But the title of the Railroads' proposal is "Promote Effective Plan Administration."  Pierce Decl. Ex. 15 at 13.  That the Railroads seek to "expressly require" some functions is not a concession that the authority does not already exist under the Plans.

[18]  Section 2, First requires "all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions."  45 U.S.C. § 152 First.

Unions in good faith." Pls.' Opp'n at 38. The Court has rejected this theory, finding the dispute "minor" because the Railroads' proposals are "arguably justified." So any remaining claim under Section 2, First also cannot survive.

A contrary holding "effectively circumvents [*Conrail*'s] minor dispute rule." *Bhd. of Maint. of Way Emps. v. CSX Transp., Inc.*, 143 F. App'x 155, 161 (11th Cir. 2005). "Virtually any dispute over the meaning of a term of an agreement could be recast as a dispute over the corresponding [Section] 2 First requirements, opening the door to federal subject matter jurisdiction." *Id.* at 161–62. If the Unions properly raised a Section 2, First claim, it will also be dismissed.

## IV.

Whether the Joint Committees can ultimately implement the network realignment and AOM Program proposals as Plan "administration" remains undetermined. The task here is not to "consider the merits of the underlying dispute." *Air Line Pilots Ass'n, Int'l*, 869 F.2d at 1521. It is only to decide whether the Railroads met their "relatively light burden" to show their position is "arguably justified" under the Plans. *Conrail*, 491 U.S. at 307. Viewed under the "strong presumption that the dispute is minor," the Court finds that the Railroads satisfied their burden. *Air Line Pilots Ass'n, Int'l*, 869 F.2d at 1522. The Unions' arguments "conceivably could carry the day in arbitration." *Conrail*, 491 U.S. at 317. They do not, however, establish that the Railroads' "contractual arguments are frivolous or obviously insubstantial." *Id.*

The Court lacks jurisdiction to resolve the Unions' challenge here. So the Court will grant Defendants' motion to dismiss. A separate Order will issue.

Dated: March 9, 2021                                        _____
                                                            TREVOR N. McFADDEN, U.S.D.J.